**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **DARRYL DAVIS**,<br><br>        **Petitioner,**<br><br>   **v.**<br><br>**ADMINISTRATOR STEVEN JOHNSON, et al.,**<br><br>        **Respondents.** | **Civil Action No. 18-12645 (SRC)**<br><br>**OPINION** |

**CHESLER, District Judge**

This matter comes before the Court upon the amended[1] petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by *pro se* Petitioner Darryl Davis ("Petitioner"), a prisoner confined at New Jersey State Prison ("NJSP") in Trenton, New Jersey.  (Am. Pet., ECF No. 21.) Petitioner is raising sixteen[2] grounds that challenge various aspects of his trial and conviction including alleged jury issues, evidentiary issues, prosecutorial misconduct, and ineffective assistance of counsel.  (*Id.* at 7–53.)  Respondents filed an answer (Resp't's Answer, ECF No. 11),

---

[1] Petitioner's original writ of habeas corpus pursuant to 28 U.S.C. § 2254 was filed on August 15, 2018 and contained exhausted and unexhausted claims.  (*See* Pet., ECF No. 1.)  The Court afforded Petitioner an opportunity to withdraw his unexhausted claims and file an amended petition clarifying his remaining claims.  (*See* ECF Nos. 19–23.)  Petitioner subsequently filed two copies of the amended petition, and the Court determined that ECF No. 21 would be the operative amended petition in this matter.  (*See* July 11, 2024 Order, ECF No. 24.)

[2] On March 7, 2024 Petitioner withdrew grounds twelve (cumulative error) and thirteen (new evidence) of his original habeas petition, as those claims are unexhausted.  (*See* Pet'r's March 7, 2024 Letter, ECF No. 19.)

and a supplemental[3] answer opposing habeas relief.  (Resp't's Suppl. Answer, ECF No. 25.)  In reply, Petitioner filed a traverse (Pet'r's Reply, ECF No. 22), and a supplemental traverse.  (Pet'r's Suppl. Reply, ECF No. 26.)  The matter is fully briefed and ready for disposition.  The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For the reasons discussed below, the Court will deny the petition and will not issue a certificate of appealability.

## I.    FACTUAL BACKGROUND

The factual background in this matter was summarized by the New Jersey Superior Court, Appellate Division ("Appellate Division") upon Petitioner's direct appeal.[4]

> Petitioner and his co-defendant, Quantis L. Goode ("Goode") (collectively "defendants") were drug dealers in the Baxter Terrace housing complex ("Baxter Terrace") in Newark, New Jersey. Petitioner was known by his street name "Dre" and Goode was known by "Ice Cream".  Murder victims Saad Rahman ("Rahman") and Samad Grimes ("Grimes") were competing drug dealers at Baxter Terrace who were involved in a territorial dispute with the defendants.  The four sporadically exchanged gunfire for several days, which culminated in the murders of Rahman and Grimes on January 7, 2007.
>
> Witness Muhammad Holiday ("Mr. Holiday") was Rahman's brother and Grimes's uncle who resided at Baxter Terrace with his wife Amina ("Mrs. Holiday").  The Holidays knew Petitioner and Goode by their street names.  Around noon on January 7, 2007, Mr. Holiday met with Rahman and Grimes in his apartment to discuss their planned use of the vestibule outside of Mr. Holiday's apartment for the sale of illegal drugs.  Because it was a Sunday, and Mr. Holiday's mother was expected to visit, he instructed Rahman and Grimes that "[there will] be no BS today, ... [you] need to go somewhere," explaining that "no BS today" meant: "[n]o shooting, no drug selling, no nothing."  Just as Rahman and Grimes left the

---

[3]  Respondents' answer to the petition for writ of habeas corpus was filed on May 11, 2023. (Resp't's Answer, ECF No. 11.)  The Court ordered Respondents to file a supplemental answer to Petitioner's amended petition.  (July 11, 2024 Order, at 2.)

[4]  The determination of facts made by the Appellate Division are presumed correct pursuant to 28 U.S.C. § 2254(e)(1).

apartment, while Mr. Holiday was within "two steps" of the door, he heard gunshots coming from the hallway. As Mr. Holiday ordered his wife to call 9-1-1, he peered through the door's peephole and observed Goode "running down the stairs shooting" with Petitioner in close proximity. The hallway was filling up with the "smoke and flash" of gunfire. Mr. Holiday dashed to a bedroom window to look outside "[be]cause [he] want[ed] to know if [his] brother got out [of] the hallway." He saw Grimes run out of the building holding a handgun while being shot at by Petitioner. Mr. Holiday observed Grimes fire once, then drop the handgun, and eventually collapse on Orange Street. Mrs. Holiday also observed these events. Goode, who followed Petitioner out of the building, could be heard telling Petitioner to stop shooting. Mr. Holiday then saw Petitioner "rush through the sidewalk" as defendants ran away from the scene. The Holidays left their apartment and found Rahman lying in the vestibule. Once outside the building, Mr. Holiday observed Petitioner and Goode sprint into a van and drive away. Mrs. Holiday did not witness Goode outside, but she did see Petitioner jump into a "tan or beige-ish van," which drove away on Orange Street. They checked on Grimes, who was still breathing. Mr. Holiday returned inside to console Rahman as he died.

Newark police and emergency personnel immediately arrived at the scene. The police recovered a Glock nine-millimeter semi-automatic pistol with defaced serial numbers on the ground near Grimes, a Mossberg twelve-gauge sawed-off shotgun with a pistol grip under Rahman's body, and numerous shell casings. Based upon statements given by the Holidays and information gathered from another resident, Ronald Alston ("Alston"), the police determined the perpetrators' names and their last-known addresses. Arrest warrants were issued for Petitioner and Goode, and the police issued a nation-wide notice that defendants were wanted in connection with the January 7, 2007 double homicide. In the ensuing days, police officers searched for defendants at several locations but were unable to locate them. Ultimately, on separate days in the following week, Petitioner and Goode voluntarily surrendered to the authorities.

On October 19, 2007, an Essex County Grand Jury returned Indictment No. 07-10-3549, charging defendants with: (1) first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a)(1) and (2) (count one); (2) two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (counts two and three); (3) two counts of third-degree unlawful possession of a handgun, N.J.S.A. 2C:39–5(b) (counts four and six); and (4) two counts of second-degree possession of a weapon with a purpose to use it unlawfully against the person of another, N.J.S.A. 2C:39-4(a)

(counts five and seven).  Defendants were tried together on various dates in June and July 2009.

At trial, the Holidays identified defendants as the perpetrators. Another witness, medical examiner Dr. Zhongxue Hua, reported that Rahman died from three gunshot wounds to his torso and legs and Grimes died from four gunshot wounds to his torso.  Doctor Hua further noted that Rahman had a bag of sixty-nine "tiny plastic vials with [a] white powdery material" in his right front pocket.  Detective Frank Faretra, a ballistics expert, testified that Rahman's sawed-off shotgun was not discharged during the incident, but that Grimes's handgun was fired three times.  There were several additional spent shell casings recovered at the scene that were fired from other weapons.  One of these shell casings was linked to a prior shooting. Faretra concluded that "five firearms were involved [in this case, but] four ... were involved in the shooting."

Salaam Grimes ("Salaam") testified that Grimes was his younger brother and Rahman was his uncle.  He knew both defendants, albeit by the names Ice Cream and Dre, and had observed them selling drugs many times in the hallways of Baxter Terrace when he visited his family.  The victims were also known to have sold drugs at that location.  Salaam was aware that there was a "beef" between defendants and his relatives, but he did not know the details of the feud.  However, Salaam indicated that Rahman told him that he had robbed defendants at the end of December 2006.  He also mentioned that he heard gunshots on New Year's Eve as he was preparing to leave a party to pick up Rahman.  Salaam immediately received a telephone call from Rahman telling him not to come to his location because defendants had been shooting at him.  Salaam was supposed to meet Rahman at Baxter Terrace on January 7, 2007.  Around noon, Salaam was on the telephone with Rahman discussing their plans when he suddenly heard gunshots, and the call ended.  After trying to call back to no avail, Salaam boarded a bus and headed to Baxter Terrace.  By the time he arrived, the incident was long over.

Ronald Alston testified that on the night of January 7, 2007, the police kicked in the door to his apartment at Baxter Terrace and began harassing him regarding the shootings that had occurred earlier that day.  Alston claimed he was drunk at the time and was both hostile and friendly with the officers.  Alston acknowledged that he gave a statement to the police that placed Goode at the scene in the early morning hours of January 7, 2007.  However, he insisted that he was intoxicated at the time of his statement and the police bullied him and told him what to say.  He denied that he saw defendants in his apartment building on a daily basis and further

maintained that although Goode was known to him, Goode was not in his apartment at 8:00 a.m. on the morning in question.

Neither Petitioner or Goode testified or presented any witnesses at trial. On July 16, 2009, the jury convicted Goode of all counts in the indictment and convicted Petitioner of all counts except conspiracy.

*State v. Davis*, No. A-1176-09, 2012 WL 2009258, at \*1–19 (N.J. Super. Ct. App. Div. June 6, 2012) (cleaned up).

## II.  <u>PROCEDURAL HISTORY</u>

On September 23, 2009, Petitioner was sentenced by Hon. Harold W. Fullilove, J.S.C. (2009 J. of Conviction, ECF No. 11-24, at 100.)  After merger, the court sentenced Petitioner to an aggregate term of sixty years' imprisonment with sixty years before parole eligibility as follows: (1) thirty years with a parole disqualifier of thirty years for the murder of Rahman; (2) a consecutive term of thirty years with a parole disqualifier of thirty years for the murder of Grimes; and (3) two concurrent five-year terms of imprisonment on counts four and six.  (*Id.*)  Petitioner filed a direct appeal of his sentence to the New Jersey Superior Court, Appellate Division.  (Pet'r's Direct Appeal, ECF No. 11-24, at 101.)  Petitioner raised the following arguments:

POINT I: THE JURY DELIBERATION PROCESS WAS SO TAINTED THAT IT DEPRIVED MR. DAVIS OF A FAIR TRIAL BECAUSE (A) DELIBERATING JUROR NUMBER FIVE WAS EXCUSED FOR REASONS OTHER THAN HIS INABILITY TO CONTINUE (B) ONCE JUROR NUMBER 5 WAS DISCHARGED, A MISTRIAL WAS REQUIRED BECAUSE THE JURY HAD BEEN TAINTED BY THE EXCUSED JUROR AND THE JURY HAD DELIBERATED SO FAR TOWARDS COMPLETION THAT THE RECONSTITUTED JURY WOULD NOT HAVE BEEN CAPABLE OF CONSIDERING MR. DAVIS' GUILT OR INNOCENCE ANEW; AND (C) AN ABSCONDING JUROR WAS ALLOWED TO CONTINUE TO DELIBERATE AFTER BEING APPREHENDED BY A SHERIFF'S OFFICER AND ORDERED TO RETURN TO COURT.

POINT II: THE TRIAL COURT ERRED BY NOT INSTRUCTING THE JURY, SUA SPONTE, WITH SELF–DEFENSE. (Not Raised Below)

POINT III: THE TRIAL COURT ERRED BY NOT INSTRUCTING THE JURY, SUA SPONTE, WITH PASSION PROVOCATION MANSLAUGHTER. (Not Raised Below).

POINT IV: THE TRIAL COURT ERRED BY GRANTING THE STATE'S N.J.R.E. 404(b) MOTION TO INTRODUCE TESTIMONY THAT THE DEFENDANTS SOLD DRUGS OUT OF 182 BAXTER TERRACE AND THERE WAS A DISPUTE BETWEEN THE DEFENDANTS AND VICTIMS OVER THIS TERRITORY TO SELL DRUGS.

POINT V: THE TRIAL COURT ERRED BY ADMITTING THE PRIOR INCONSISTENT STATEMENT OF RONALD ALSTON.

POINT VI: THE TRIAL COURT ERRED BY PERMITTING RONALD ALSTON TO TESTIFY IN A CLEARLY INTOXICATED STATE IN VIOLATION OF N.J.R.E. 601 AND ERRED BY DENYING MR. DAVIS' MOTION FOR A MISTRIAL AND SEVERANCE.

POINT VII: THE TRIAL COURT ERRED BY DENYING MR. DAVIS' MOTION TO SUPPRESS THE EYEWITNESS' IDENTIFICATION, BECAUSE THE PRETRIAL IDENTIFICATION PROCEDURE WAS IMPERMISSIBLY SUGGESTIVE, WHICH CAUSED A SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION.

POINT VIII: THE TRIAL COURT ERRED BY ALLOWING THE STATE TO INTRODUCE A PHOTOGRAPH OF AN UNRELATED MASK WITH THE FACE CUT OUT BECAUSE ITS PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY THE RISK OF UNDUE PREJUDICE AND MISLEADING THE JURY.

POINT IX: THE PROSECUTOR COMMITTED MISCONDUCT BY ELICITING TESTIMONY FROM THE STATE'S BALLISTIC EXPERT THAT THE MURDER WEAPON WAS USED IN A PRIOR SHOOTING, KNOWING THIS EVIDENCE WAS INADMISSIBLE, AND THE TRIAL COURT ERRED BY NOT GIVING A LIMITING INSTRUCTION SUA SPONTE. (Not Raised Below).

POINT X: THE TRIAL COURT ERRED BY EXCLUDING MR. DAVIS FROM THE VOIR DIRE OF JUROR NUMBER 5 BEFORE HIS DISCHARGE AFTER THE JURY HAD DELIBERATED ONE DAY.

POINT XI: MR. DAVIS WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL DUE TO COUNSEL'S (A) ERRONEOUS INTRODUCTION OF INADMISSIBLE EVIDENCE OF A PRIOR SHOOTING MR. DAVIS WAS ALLEGED TO HAVE BEEN INVOLVED; (B) FAILURE TO OBJECT WHEN THE STATE ELICITED TESTIMONY OF A SEARCH WARRANT FOR MR. DAVIS' HOME. (Not Raised Below).

(Pet'r's Direct Appeal Br., at 2–4.)

The Appellate Division rejected Petitioner's arguments and affirmed his conviction and sentence on June 6, 2012. *Davis*, 2012 WL 2009258, at *19. Petitioner sought certification from the Supreme Court of New Jersey and raised the following arguments:

1. When a deliberating juror only states to the trial court during voir dire that "this is a serious case, and I don't want anything to happen to me, like, you know what I mean," should he be excused pursuant to R. 1:8-2(d)(1) as "unable to continue," when other jurors began to inform the court that his fear was related to the outcome, but were not permitted to continue?

2. Does a jury reach an advanced stage of deliberations, thus precluding reconstitution, when the jury has deliberated for over five hours and having asked for the definition of aggravated and reckless manslaughter, thereby expressing their view that they reached a verdict of not guilty on the murder charges for one or both of the defendants?

3. When a juror announces to his fellow jurors that he is not returning and then lies to the court concerning his whereabouts, is he fit to serve on a jury deciding a murder case?

4. When the testimony adduced at trial indicates that it is unclear who shot first, the victim or the defendant, and that the victims were the aggressors in a drug war, is the court required to instruct the jury with self-defense sua sponte?

> 5. When a defendant is being shot at by the alleged victim, is the court required to instruct the jury with passion provocation manslaughter sua sponte?

(Pet'r's Certification Br., ECF No. 11-26.)  In a footnote, Petitioner incorporated by reference all of the claims raised on direct appeal to the Appellate Division  for the Supreme Court to consider as a basis for granting certification.  (*Id.* at 9 n.3.)  On January 16, 2013, the Supreme Court of New Jersey summarily denied certification. *State v. Davis,* 65 A.3d 834 (N.J. 2013) (unpublished table decision).

Petitioner filed a *pro se* petition for post-conviction relief ("PCR") on February 11, 2013 (Pet'r's PCR, ECF No. 11-28, at 85–88) and an amended petition was filed by counsel on September 18, 2013.  (Pet'r's Am. PCR, ECF No. 11-28, at 89–94.)  Hon. Michael A. Petrolle, J.S.C., heard oral argument on the PCR on November 18, 2014 and denied the petition without an evidentiary hearing for reasons expressed on the record.  (Nov. 18, 2014 Order, ECF No. 11-28, at 120.)  Petitioner appealed the decision to the Appellate Division.  (Pet'r's PCR Appeal, ECF No. 11-28, at 121–122.)  The Appellate Division reversed and remanded for an evidentiary hearing in its February 2, 2017 opinion. *State v. Davis*, No. A-3213-14, 2017 WL 444295, at *1–5 (N.J. Super. Ct. App. Div. Feb. 2, 2017).  On April 25, 2017, Petitioner filed a petition for certification to the Supreme Court of New Jersey, (ECF No. 11-32), which was denied on July 5, 2017. *State v. Goode/Davis*, 170 A.3d 316 (N.J. 2017) (unpublished table decision); *see also State v. Goode/Davis*, 170 A.3d 318 (N.J. 2017) (unpublished table decision).

On remand, the trial court held the evidentiary hearings on June 26 and July 9, 2019.  (PCR Status Conf., ECF Nos. 11-19, 11-20.)  On March 31, 2020, PCR Judge Petrolle issued an order and accompanying written opinion denying Petitioner's application for post-conviction relief as amended.  (Mar. 31, 2020 PCR Order, ECF No. 11-37.)  Petitioner appealed Judge Petrolle's

ruling.  (Pet'r's Second PCR Appeal, ECF No. 11-41.)  The Appellate Division issued its opinion affirming the trial court's denial of Petitioner's PCR petition on June 30, 2021. *State v. Davis*, A-0735-20, 2022 WL 533741, at *1–2 (N.J. Super. Ct. App. Div. Feb. 23, 2022).  The Supreme Court of New Jersey denied certification on October 7, 2022. *State v. Davis*, 283 A.3d 141 (N.J. 2022).

On August 15, 2018, Petitioner filed a *pro se* habeas petition that contained both exhausted and unexhausted claims.  (*See* Pet., at 1–34.)  On March 11, 2019, the Court granted Petitioner's motion for stay pending the exhaustion of his claims in state court.  (March 11, 2019 Order, ECF No. 4.)  In March 2023, Petitioner confirmed that his claims had been exhausted and requested to have this matter reopened, but did not request to file an amended habeas petition.  (Pet'r's Feb. 24, 2023 Letter, ECF No. 5.)  The Court ordered the matter reopened and for the state to file an answer.  (March 11, 2023 Order, ECF No. 6.)  In May 2023, Respondents filed an answer, in which they asserted, among other things, that two of Petitioner's claims, including claims twelve and thirteen of the original petition, were not exhausted and that dismissal of the petition was therefore warranted.  (Resp't's Answer, at 101–02.)  The Court afforded Petitioner an opportunity to withdraw his unexhausted claims and file an amended petition clarifying his remaining claims.  (*See* ECF Nos. 19–23.)  Petitioner indicated that he wished to withdraw his unexhausted claims and file an amended petition clarifying his remaining claims.  (Pet'r's March 7, 2024 Letter, at 3.)  Petitioner subsequently filed two copies of the amended petition—one on April 9, 2024 and another on April 23, 2024—and this Court determined that ECF No. 21 would be the operative amended petition in this matter.  (*See* July 11, 2024 Order, ECF No. 24.)  In filing his amended petition, Petitioner included not only the exhausted claims from the original petition, but also several claims which expanded upon or wholly reargued several claims for relief Petitioner apparently pursued in his state court proceedings.  (*See* ECF No. 21 at claims twelve through

sixteen.)  On July 11, 2024 the Court ordered Respondents to file a supplemental answer to Petitioner's amended petition  to specifically address whether any claims in the amended petition remain unexhausted, untimely, or otherwise barred.  (July 11, 2024 Order, at 2.)  Respondents filed their supplemental answer on July 24, 2024, and argue that Petitioner raised new grounds for relief that should not be considered by the Court because Petitioner has not been permitted to file an amended petition adding new claims.  (Resp't's Suppl. Answer, at 2.)  On August 23, 2024, Petitioner filed a supplemental traverse.  (Pet'r's Suppl. Reply, 1–14.)  In his supplemental traverse, Petitioner disputes Respondent's allegations that Ground Eleven (b) is unexhausted.  (*Id.* at 10–12.)  Petitioner also contends that no new grounds were raised in his amended petition, and the claims are identical "except for the fact that fewer Grounds were raised in the Amended petition."  (*Id.* at 6.)

## III.  <u>LEGAL STANDARD</u>

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), which amended 28 U.S.C. § 2254, a district court "shall entertain an application for writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254.  Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011); *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013).

Moreover, district courts are required to give great deference to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).  Specifically, district courts must defer to the "'last reasoned' decision of the state courts on the petitioner's claims."

*Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009).  Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in United States Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from United States Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)).  "Clearly established federal law for purposes of [Section 2254(d)(1)] includes only the holdings, as opposed to the dicta of the United States Supreme Court's decisions." *See Woods v. Donald*, 575 U.S. 312, 316 (2015).  An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (quoting *Renico*, 559 U.S. at 773).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 575 U.S. at 316.  Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have

the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

## IV.  <u>DISCUSSION</u>

Petitioner raised eleven claims to the Appellate Division and Supreme Court of New Jersey on direct appeal. *See Davis*, 2012 WL 2009258, at *3–4; (*see* Pet. for Certification on Direct Appeal, ECF No. 11-28, at 84.) The Appellate Division declined to address Petitioner's claims of ineffective assistance of counsel, finding them best left to post-conviction review. *Davis*, 2012 WL 2009258, at *19. Petitioner filed a petition for post-conviction relief (Pet'r's Am. PCR, ECF No. 11-28, at 89–94), which was denied by Hon. Michael A. Petrolle, J.S.C. without an evidentiary hearing. (Nov. 18, 2014 Order, ECF No. 11-28, at 120.) Petitioner appealed the trial court's denial of his PCR petition, which was reversed and remanded by the Appellate Division for an evidentiary hearing. *See State v. Davis*, No. A-3213-14, 2017 WL 444295, at *1–5. On remand, the trial court denied Petitioner's second PCR petition, which was affirmed by the Appellate Division. *See Davis*, 2022 WL 533741, at *1–2.

As the Supreme Court of New Jersey summarily denied each of Petitioner's petitions for certification, the Appellate Division's decisions constitute the "last reasoned" decision of the state courts regarding each of these claims. *See Simmons*, 590 F.3d at 231–32. Accordingly, this Court applies AEDPA deference to the Appellate Division's decisions. *See id.*

### A.  New Claims

Respondents contend that Petitioner raised new grounds for relief that should not be considered by the Court because the newly asserted claims do not relate back to the original habeas petition, and thus are time-barred by the AEDPA.  (Resp't's Suppl. Answer, at 2–4.)  Petitioner denies that he asserted any new claims and argues that the only amendments made from the original petition were the deletion of two unexhausted claims.  (Pet'r's Suppl. Reply, at 6.)

Under Federal Rule of Civil Procedure 15, which is also applicable to habeas petitions, a petitioner may amend his petition at any time with "leave of court." *Mayle v. Felix*, 545 U.S. 644, 655 (2005).  A court is instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).  Amendments that are made after the statute of limitations, however, must "relate back" to the original pleading. *See United States v. Santarelli*, 929 F.3d 95, 101 (3d Cir. 2019); *see also* Fed. R. Civ. P. 15(c)(2).  AEDPA provides that habeas petitions must be filed within one year of the date on which the conviction becomes final. 28 U.S.C. § 2244(d).  A conviction may become "final" under AEDPA on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  Any time during which a petitioner files an application for state post-conviction relief tolls the statute of limitations. 28 U.S.C. § 2244(d)(2).  An amendment is deemed to "relate back" as long as the "original and amended petitions state claims that are tied to a common core of operative facts[.]" *Mayle*, 545 U.S. at 664.  "An untimely claim 'does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Whitaker v. Superintendent Coal Twp. SCI*, 721 F. App'x 196, 201 (3d Cir. 2018) (quoting *Mayle*, 545 U.S. at 650)).

Here, all of the claims in Petitioner's amended petition for writ of habeas corpus were raised in, or "relate back to" the original petition. Thus, they are not time-barred by the AEDPA.

**B. Grounds Two, Three, Four, Five, Six, Eight, & Nine: Non-Cognizable State Law Claims**

As an initial matter, Petitioner raises several claims for relief based on state law grounds that challenge rulings made by the trial court. Specifically, in Grounds Two and Three, Petitioner argues that the trial court erred by not *sua sponte* instructing the jury on self-defense (Ground Two) and passion provocation manslaughter (Ground Three). (Am. Pet., at 11–15.) In Ground Four, Petitioner argues that the trial court improperly granted the New Jersey Rule of Evidence 404(b)[5] ("Rule 404(b)") motion to introduce testimony that the defendants sold drugs out of Baxter Terrace and that there was a territorial dispute between defendants and the victims. (*Id.* at 15–17.) In Ground Five, Petitioner argues that the trial court erred by admitting Ronald Alston's prior inconsistent statement as substantive evidence at trial. (*Id.* at 18–20.) In Ground Six, Petitioner challenges the trial court's denial of his motion for a mistrial and severance from his co-defendant based on Alston testifying at trial in a clearly intoxicated state in violation of New Jersey Rule of Evidence 601 ("Rule 601").[6] (*Id.* at 20–23.) In Ground Eight, Petitioner argues that he was deprived of a fair trial because the trial court permitted the State to introduce into evidence a photograph of a mask with an open face, over defense counsel's objection. (*Id.* at 25–26.) Finally,

---

[5] Rule 404(b) provides, "[e]xcept as otherwise provided . . . evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." N.J.R. Evid. 404(b)(1). However, "[t]his evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute."

[6] Rule 601 provides, "[e]very person is competent to be a witness unless (a) the court finds that the proposed witness is incapable of expression so as to be understood by the court and any jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) as otherwise provided by these rules or by law."

in Ground Nine, Petitioner asserts that the trial court was required to *sua sponte* give limiting instructions after the prosecutor elicited testimony from the ballistic expert that the murder weapon was used in a prior shooting.  (*Id.* at 26.)

A federal court may consider arguments alleging that a state prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citing *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010)); *see also* 28 U.S.C. § 2254(a). The Supreme Court has interpreted the habeas statute to bar federal courts from granting relief based on violations of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.*  Petitioner cites to no constitutional provision or federal law to support his claims that challenge the rulings of the trial court.  Petitioner's claims for relief in Grounds Two, Three, Four, Five, Six, Eight, and Nine arise under state law and do not allege a "violation of the Constitution or laws or treaties of the United States" *See Swarthout*, 562 U.S. at 219.  Accordingly, the Court will deny these claims as failing to set forth a viable ground for habeas relief.

### C.  Grounds One & Ten: Jury Deliberation Process

Petitioner raises several grounds for relief alleging that the trial court committed the following errors that violated his constitutional right to a fair trial: (1) discharging a juror after deliberations had begun, (2) substituting an alternate juror when the jury had deliberated so far towards completion, and (3) allowing an absconding juror to continue to deliberate.  (Am. Pet., at 7–10.)  Petitioner also alleges that the trial court erred by excluding him from the *voir dire* of a juror prior to the juror being discharged.  (*Id.* at 27–28.)

The Sixth Amendment promises that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein

the crime shall have been committed, which district shall have been previously ascertained by law." U.S. Const. amend. VI. "By operation of the Fourteenth Amendment it is applicable to the states." *Duncan v. Louisiana*, 391 U.S. 145, 149–50 (1968). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. . . 'A fair trial in a fair tribunal is a basic requirement of due process.'" *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551 (1976) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

### 1. Ground One

In Ground One of the habeas petition, Petitioner argues that the tainted jury deliberation process deprived him of a fair trial for the following three reasons. (Am. Pet., at 7.) First, Petitioner argues that the trial court abused its discretion by discharging juror number five after deliberations had begun. (*Id.*) Second, Petitioner claims that a mistrial was required once juror number five was discharged because the jury had been tainted by the excused juror and the jury had deliberated so far towards completion that the jury as reconstituted with an alternate, would not have been able to consider Petitioner's guilt or innocence anew. (*Id.*) Finally, Petitioner contends that the trial court erred by allowing absconding juror King[7] to continue to deliberate after being apprehended by a sheriff's officer. (*Id.*)

Respondents argue that Petitioner fails to show how the Appellate Division's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. (Resp't's Answer, at 43.) Specifically, Respondents contend that the trial court's juror substitution procedure complied with both New Jersey law and *Claudio v. Snyder*, 68 F.3d 1573, 1576 (3d Cir. 1995),[8] because the substitution was due to personal reasons

---

[7] The Appellate Division assigns the absconding juror a pseudonym. *See Davis*, 2012 WL 2009258, at *8 n.5. Accordingly, this Court will likewise refer to the juror as "King".
[8] *Claudio v. Snyder*, 68 F.3d 1573, 1576 (3d Cir. 1995) held that substitution of an alternate juror when the original juror became ill was consistent with the Sixth and Fourteenth Amendments.

unrelated to the deliberative process. (*Id.* at 44.) Respondents further contend that deliberations had not proceeded so far as to make substitution inappropriate. (*Id.*) In reply, Petitioner largely repeats the arguments raised in his amended habeas brief. (Pet'r's Reply, at 13–31.) Petitioner contends that the state court's decision was an unreasonable application of clearly established federal law. (*Id.*)

### a. Discharging Juror Five After Deliberations Began

Petitioner argues that the trial court abused its discretion by discharging juror number five after deliberations had commenced. (Am. Pet., at 7.) Petitioner raised these claims during his direct appeal. (Pet'r's Direct Appeal Br., at 30–47.) The Appellate Division considered Petitioner's claims in light of controlling law. *See Davis*, 2012 WL 2009258, at *4–9. The court analyzed Petitioner's claims related to the discharge of juror number five as follows:

> The grant of a mistrial should be exercised only to prevent manifest injustice. *State v. Ribalta*, 277 N.J. Super. 277, 291 (App. Div. 1994), *certif. denied*, 139 N.J. 442 (1995). Thus, we defer to the trial judge's decision and will not intervene when a mistrial has been denied unless there was a clear showing of a mistaken exercise of discretion, *State v. Winter*, 96 N.J. 640, 646–47 (1984), or if "manifest injustice would ... result," *State v. LaBrutto*, 114 N.J. 187, 207 (1989).

> Trial courts are authorized to excuse jurors "because of illness or other inability to continue" and replace them with an alternate if deemed appropriate. *R.* 1:8–2(d)(1); *State v. Valenzuela*, 136 N.J. 458, 476 (1994). Substitution of a juror does not impair a defendant's right to a fair and impartial jury if the reason for excusing the juror " 'relate[s] exclusively to the personal situation of the juror himself and not to his interaction with the other jurors or with the case itself, [because] they are ordinarily not circumstances having the capacity to affect the substance or the course of the deliberations.' " *Id.* at 468 (quoting *State v. Trent*, 157 N.J. Super. 231, 239 (App. Div. 1978), *rev'd* on other grounds, 79 N.J. 251 (1979)).

> The reason for Fisher's excusal was personal to him. The trial court's management of the events surrounding Fisher's unease as a

> juror was appropriate to the circumstances and fully sufficient to satisfy due process concerns. There was an adequate reason to excuse Fisher. The rationale was divorced from the inner workings of the trial and a mistrial was wholly unwarranted given the stage of the proceedings.

*Davis*, 2012 WL 2009258, at *7.

In the context of juror substitution after deliberations have commenced, Petitioner fails to demonstrate that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).  A state court decision is "contrary to" United States Supreme Court clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the Supreme Court's cases. *See Taylor*, 529 U.S. at 405. A state court decision will also be contrary to Supreme Court clearly established precedent if "the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from our precedent." *Id.* at 406.  "Avoiding these pitfalls does not require citation of our cases—indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  An "unreasonable application" of clearly established federal law requires consideration of a specific legal rule. *Harrington*, 562 U.S. at 101. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Therefore, "it is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the [Supreme Court]." *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

Here, Petitioner has cited no United States Supreme Court decision, and this Court has not located any, addressing whether the substitution of a juror after jury deliberations have begun

violates a criminal defendant's due process rights. *See Claudio v. Snyder*, 68 F.3d 1573, 1576 (3d Cir. 1995) (finding "the Supreme Court has not specifically ruled on the constitutionality of substituting an alternate juror after jury deliberations have begun"). In the absence of United States Supreme Court precedent on this issue, this Court cannot conclude that the Appellate Division's decision regarding juror substitution after jury deliberations have begun was contrary to or an unreasonable application of clearly established federal law.

Second, Petitioner's more broad argument alleging violation of due process and fundamental fairness also fails because the Appellate Division's determination was consistent with federal law. The Due Process Clause safeguards "the fundamental elements of fairness in a criminal trial." *Rivera v. Illinois*, 556 U.S. 148, 158 (2009) (quoting *Spencer v. Texas*, 385 U.S. 554, 563–64 (1967)). The Supreme Court has recognized that a limited class of fundamental constitutional errors is so intrinsically harmful as to require automatic reversal (*i.e.,* "affect substantial rights") without regard to their effect on a trial's outcome. *Neder v. United States*, 527 U.S. 1, 7 (1999). Such errors, "infect the entire trial process," *Id.* at 9 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 630 (1993)), and necessarily render a trial fundamentally unfair. *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)). These errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence … and no criminal punishment may be regarded as fundamentally fair." *Rose*, 478 U.S. at 577–78. "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Id*. To satisfy due process, "'[a] defendant is entitled to a fair trial, but not a perfect one,' for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 232 (1973) (citing *Bruton v. United States*, 391 U.S. 123, 135 (1968)).

The Appellate Division determined that there was adequate reason for the trial court to excuse juror number five. *See Davis*, 2012 WL 2009258, at *7. Moreover, the Appellate Division applied the standard established by the Supreme Court in determining that the trial court's management of events surrounding the discharge of juror five was fully sufficient to satisfy due process concerns. *Id*. Despite contentions that he "was deprived his federal right when the trial court discharged juror number 5 for reasons that were not personal to the juror," Petitioner utterly fails to demonstrate that the Appellate Division's decision was contrary to clearly established federal law, as evidenced by the record and Petitioner's reliance on state law to support his argument. (*See* Am. Pet., at 7–8.) Therefore, Ground One (a) of the petition will be denied.

### b. Jury Taint by Substituted Juror

Petitioner claims that a mistrial was required once juror number five was discharged because the jury had been tainted by the excused juror and the jury had deliberated so far towards completion that the jury as reconstituted with an alternate, would not have been able to consider Petitioner's guilt or innocence anew. (Am. Pet., at 7.) Petitioner raised these claims on direct appeal. (Pet'r's Direct Appeal Br., at 30–47.) The Appellate Division considered Petitioner's claims in light of controlling law. *See Davis*, 2012 WL 2009258, at *7–8. The Appellate Division addressed Petitioner's claims as follows:

> The initial jury deliberated for approximately five hours prior to Fisher's note. During that time, the court was asked four separate questions, only one of which was substantive: (1) "[w]e wanted to know if [Mrs.] Holiday's statement or tape is available"; (2) "[c]an we have the guns removed from the jury room"; (3) "[w]e want the definition of agg[gravated] and reckless manslaughter"; and (4) Fisher's "[a]m I safe when I leave the building and go home?" The reconstituted jury commenced deliberations four full days later and deliberated for approximately eight hours over the next three days when it finally indicated that a unanimous verdict had been reached.

We are unable to agree with defendants' arguments that these circumstances rendered the trial court's substitution erroneous. We discern nothing in this record to suggest that Fisher's situation was based upon anything other than his subjective concerns, unrelated to the substantive issues in the case. It is pure conjecture to suggest that at the time Fisher sent his note, the views of other jurors had sufficiently crystallized to a point that a substitution would render renewed deliberations futile. Evidence of jury entrenchment is absent from the record. The trial court did not deprive defendants of any due process rights.

*Rule* 1:8–2(d)(1) provides: "When such a substitution of an alternate juror is made, the court shall instruct the jury to recommence deliberations and shall give the jury such other supplemental instructions as may be appropriate." The court must also instruct the jury in clear and unequivocal terms that it must begin its deliberations anew and in effect, start over. *Trent*, supra, 79 N.J. at 255. We are satisfied that these obligations were properly fulfilled by the trial court.

*Davis*, 2012 WL 2009258, at *7–8.

Petitioner fails to demonstrate that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law with respect to his claims that juror five introduced bias into the jury room and "tainted" the jury with fear of retaliation by communicating concerns for his safety. (*See* Am. Pet., at 9.) Petitioner fails to identify any clearly established federal law which addresses this issue. *See* 28 U.S.C. § 2254(d)(1). Petitioner baldly alleges, without support, that "when juror bias is injected into the jury room … it is not resolved by dismissing and replacing the juror who introduced the bias. The removal of a juror for bias during deliberations will ordinarily prohibit reconstituting the jury with an alternate and call for a mistrial." (Am. Pet., at 8.)

"Among basic fair trial rights that cannot be treated as harmless error is a defendant's right to an impartial adjudicator." *Gomez v. United States*, 490 U.S. 858, 876 (1989). To that end, the Supreme Court has relied on the underlying fundamental fairness principle in the jury-impartiality

context. *See, e.g. Rideau v. Louisiana*, 373 U.S. 723, 726 (1963); *Skilling v. United States*, 561 U.S. 358, 379 (2010). Specifically, the Supreme Court "generally ha[s] analyzed outside intrusions upon the jury for prejudicial impact." *United States v. Olano*, 507 U.S. 725, 738 (1993). However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation . . .[because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Rushen v. Spain*, 464 U.S. 114, 118 (1983) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). "There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Rushen*, 464 U.S. at 118. In determining if juror bias deprived defendant of a fair trial, it is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court. *Skilling*, 561 U.S. 398–99.

In *Remmer v. United States*, 347 U.S. 227 (1954), the Supreme Court remanded for the District Court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate" where an outsider communicated with a juror and appeared to offer a bribe, which prompted an F.B.I. investigation. *Id*. at 229–30. The Supreme Court noted that "the sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror." *Id.* Contrasted with the instant case, where the Appellate Division noted no "[e]vidence of jury entrenchment" based on juror five's conduct. *See Davis*, 2012 WL 2009258, at *7–8. In his brief, Petitioner argues that "[t]he juror poisoned the panel with fear of retaliation if they either convicted or acquitted" however, the record reveals that the trial court took remedial measures to determine any prejudicial impact by individually questioning each juror in chambers with all counsel present, to

22

"make inquiry as to what, if any, impact those statements [of Fisher] may have had on the balance of the panel." *See Davis*, 2012 WL 2009258, at *5.

In considering these factors on appeal, the Appellate Division concluded "[w]e are unable to agree with defendants' arguments that these circumstances rendered the trial court's substitution erroneous." *Davis*, 2012 WL 2009258, at *7.  The court applied the standard established by the Supreme Court and determined that there was no violation of Petitioners' due process rights in connection with the discharge of juror five. *See Sperry & Hutchinson Co. v. Rhodes*, 220 U.S. 502, 505 (1911).  Accordingly, the Appellate Division's determination involved a reasonable application of Supreme Court precedent.

The Court now turns to the second part of Petitioner's argument, where he alleges that the jury had deliberated so far towards completion that the reconstituted jury would have been unable to consider his guilt or innocence anew.  (Am. Pet., at 7.)  Petitioner essentially argues that the jury could not be impartial after one day of deliberations with juror number five.  (*Id*. at 8–9.)  The Supreme Court has recognized that there are good reasons to apply the statutory presumption of correctness to the trial court's resolution of issues of juror impartiality in habeas proceedings. *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  "First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning . . . usually identifies bias." *Id.*  "Second, the determination is essentially one of credibility, and therefore largely one of demeanor." *Id.*  The Supreme Court also noted: "[a]s we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference.'" *Id.*  "The respect paid such findings in a habeas proceeding certainly should be no less." *Id.*

Petitioner does not cite to, and this Court could not find any, clearly established United States Supreme Court precedent which addresses the issue of jury deliberations proceeding "too far" to permit replacement of a deliberating juror with an alternate. *See* 28 U.S.C. § 2254(d)(1). However, for illustrative purposes, this Court has identified Third Circuit precedent on this issue. *See e.g. United States v. James*, 955 F.3d 336, 348 (3d Cir. 2020) (holding "[b]ecause all deliberating jurors heard all of the evidence and were properly instructed, and there is nothing in the record suggesting that the deliberating jurors lacked impartiality or the competence to understand the evidence and the instructions, or that the excused juror tainted or otherwise impaired the reconstituted jury that delivered the verdict, the Court's substitution of Juror 8 with an alternate neither prejudiced James nor violated his Fifth Amendment due process right or Sixth Amendment right to an impartial jury.")

Petitioner has not demonstrated how the trial court's substitution of juror number five, within this context, violated his right to a fair trial. Although Petitioner argues the jury had "deliberated so far towards completion" when juror five was excused, the Appellate Division clearly considered and articulated that the first jury had not been deliberating for a significant period of time prior to discharging and substituting juror number five. *See Davis*, 2012 WL 2009258, at *7. As the court highlighted in its opinion, the initial jury deliberated for approximately five hours prior to juror five's note, and the reconstituted jury "commenced deliberations four full days later and deliberated for approximately eight hours over the next three days when it finally indicated that a unanimous verdict had been reached." *Id*. Petitioner's claims of deliberations advancing so far as to preclude juror substitution are severely undermined by the fact that the reconstituted jury deliberated for almost double the amount of time as the initial jury. Moreover, the Appellate Division concluded that "[i]t is pure conjecture to suggest that at the time

Fisher sent his note, the views of other jurors had sufficiently crystallized to a point that a substitution would render renewed deliberations futile." *Id.* As the Appellate Division's determination was neither contrary to, nor an unreasonable application of, clearly established federal law, Ground One (b) is denied.

### c. Absconding Juror

Petitioner contends that the trial court erred by allowing absconding juror King to continue to deliberate after being apprehended by a sheriff's officer. (Am. Pet., at 7.) More specifically, Petitioner contends that a mistrial was required because the absconding juror lied to the court about the reasons for his failure to return to court after lunch, which Petitioner claims is demonstrative of his inability to follow the law. (*Id.* at 9.) Petitioner raised these claims during his direct appeal. (Pet'r's Direct Appeal Br., at 30–47.) The Appellate Division considered Petitioner's claims in light of controlling law. *See Davis*, 2012 WL 2009258, at *4–9. The Appellate Division analyzed Petitioner's claims related to the "absconding" juror as follows:

> Davis argues that King's story was clearly fabricated and a mistrial was necessary to ensure the integrity of the administration of justice. He posits the following: (1) King was likely a lone dissenting juror who chose to "abscond" rather than face the other eleven jurors; (2) the Sheriff's Officer who found King undoubtedly "would have forcibly brought [King] back to court if he resisted"; and (3) the jury likely returned its verdict before lunch because they believed that King was going to "run again at the lunch break." These conjectural musings are insufficient to undermine our confidence in the trial court's management of the situation.
>
> We review the trial court's findings by application of the standard enunciated in *State v. Locurto*, 157 N.J. 463, 471 (1999), which requires appellate deference to factual findings when those findings could reasonably be reached through reliance on credible evidence in the record. *See also State v. Diaz–Bridges*, 208 N.J. 544, 565 (2012) (reiterating that appellate courts must give due deference to trial courts' fact-findings). Only when the record produces a "feeling of 'wrongness' "—that is, when the appellate court is "thoroughly satisfied that the finding is clearly a mistaken one and so plainly

> unwarranted that the interests of justice demand intervention and correction"—will we disregard a judge's factual finding. *Locurto*, supra, 157 N.J. at 471 (quoting *State v. Johnson*, 42 N.J. 146, 162 (1964)). Having applied this standard of review, we defer to the trial court's acceptance of King's explanation and its ruling to restore his place on the deliberating jury was not a miscarriage of justice.

*Davis*, 2012 WL 2009258, at *9.

"Any order granting a mistrial at the behest of a defendant in a criminal case is typically based upon error or misconduct on the part of other counsel or the court." *Divans v. California*, 434 U.S. 1303 (Rehnquist, J., in chambers 1977).  Although Petitioner alleges that he was entitled to a mistrial based upon the trial court's error in failing to discharge juror King, the Supreme Court has held that there is no entitlement to a new trial based on a juror's dishonest response unless the juror's response denied defendant's right to an impartial jury. *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 549 (1984).  "We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556.  "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  *Id.*

Here, Petitioner has presented only bald assertions based on second-hand information in support of his conclusion that juror King's story was fabricated. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010) ("Bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing' on a habeas petition" (quoting Campbell v. Burris, 515 F.3d 172, 184 (3d Cir. 2008)).  Additionally, Petitioner has failed to show that the trial court determination in King's ability to remain impartial was an error.  In light of these facts, the Appellate Division's decision that deferred to "the trial court's acceptance of King's explanation and its ruling to restore his place on the deliberating jury was not a miscarriage of justice" was not

contrary to, or an unreasonable application of clearly established Supreme Court law. *Davis*, 2012 WL 2009258, at *9.  Petitioner has failed to make out a valid basis for habeas relief in this claim, and thus Ground One (c) is denied.

### 2.  Ground Ten

In Ground Ten, Petitioner argues that the trial court erred by excluding him from the *voir dire* of juror number five.  (Am. Pet., at 27.)  Petitioner alleges due process violations pursuant to the Fifth and Fourteenth Amendments based on his Sixth Amendment right to be present at every "critical stage" of a trial proceeding.  (*Id.* at 28.)

Respondents contend that, after jury selection, Petitioner had no need to be present during any stage of the proceeding where evidence was not being presented against him and no examinations or proofs were being adduced.  (Resp't's Answer, at 45.)  In his reply brief, Petitioner argues that the trial court erred by conducting the hearing in his absence.  (Pet'r's Reply, at 45.)

The Appellate Division determined that Petitioner's claim of trial court error as a result of excluding him from the *voir dire* of juror number five lacked sufficient merit to warrant any discussion in its opinion.[9] *See Davis*, 2012 WL 2009258, at *19.

The right to be present at trial is rooted in the Confrontation Clause, *Illinois v. Allen*, 397 U.S. 337, 338 (1969), but this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. *United States v. Gagnon*, 470 U.S. 522, 526 (1985).  "The Due Process Clauses of the Fifth and Fourteenth Amendments guarantee a criminal defendant the right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend

---

[9] Section 2254(d) does not require a state court to give reasons before its decision can be deemed to have been "adjudicated on the merits." *Harrington v. Richter*, 562 U.S. 86, 100 (2011).

against the charge.'" *Ross v. District Attorney of the County of Allegheny*, 672 F.3d 198,  (3d Cir. 2012) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)).

The Supreme Court has recognized that the right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant. *Rushen*, 464 U.S. at 117.  A "critical stage" of trial for purposes of Sixth Amendment right to a fair trial, is characterized as one that "held significant consequences for the accused." *Woods v. Donald*, 575 U.S. 312, 315 (2015).  However, the Supreme Court has determined that a defendant's rights under the Fifth Amendment Due Process Clause do not extend to in-camera discussions with a juror. *See Gagnon*, 470 U.S. at 526.   "[T]he mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right. The defense has no constitutional right to be present at every interaction between a judge and a juror, nor is there a constitutional right to have a court reporter transcribe every such communication." *Id.* (quoting *Rushen,* 464 U.S. at 125–126 (STEVENS, J., concurring in judgment)).

Here, upon juror five's request, the trial court held an in-camera discussion with the juror and counsel concerning juror five's safety concerns.  (*See* Trial Tr., at 13T:33–21 to 60–14.)  The trial judge ultimately dismissed juror five after he expressed an inability to make a decision about the case without the intrusion of emotions.  (*Id.* at 13T:51–19 to 52–5.)  In light of the Supreme Court's holding in *Gagnon*, Petitioner cannot demonstrate that the Appellate Division's decision was contrary to, or involved an unreasonable application of, clearly established Federal law. Therefore, Petitioner is not entitled to relief and this claim will be denied.

### D. Ground Seven: The Holidays' Out-of-Court Identification of Petitioner

In Ground Seven, Petitioner asserts a violation of his constitutional rights based on the trial court's denial of his motion to suppress the eyewitness identification. (Am. Pet., at 23–25.) Petitioner contends that the pretrial identification procedures were impermissibly suggestive. (*Id.*) Petitioner specifically alleges that the procedure utilized to secure the Holidays' out-of-court identifications were impermissibly suggestive because they reviewed the mug shot arrays together and simultaneously identified Petitioner as one of the perpetrators. (*Id.* at 23–24.) Petitioner further challenges the reliability of the identification procedures based on both witnesses' initial report to police that the perpetrators were wearing open faced masks at the time of the shooting. (*Id.*)

Respondents contend that under the totality of the circumstances, Muhammad Holiday's identification of Petitioner was based on his observations on the day of the crimes, and nothing else. (Resp't's Answer, at 75.) In reply, Petitioner argues that even though this is a state process, there is a federal violation of his right to a fair trial based on investigating officials creating "a prejudicial environment" related to the eyewitness identification. (Pet'r's Reply, at 36.) Petitioner requested that this Court determine whether the identification procedures were impermissibly suggestive. (*Id.* at 37.) Petitioner contends that the lower court's ruling that "there was no injustice in this issue was a clear violation of established federal law." (*Id.* at 38.)

Petitioner raised this claim during his direct appeal. (Pet'r's Direct Appeal Br., at 2–4.) In rejecting Petitioner's arguments, the Appellate Division analyzed the claim as follows:

> Prior to trial, the defense moved to suppress these out-of-court identifications. At a Wade hearing, Mr. Holiday testified that he witnessed both shootings and that he knew who the perpetrators were because they had been selling drugs outside his apartment door for months. Similarly, Mrs. Holiday testified that she saw defendants together at the time of the shootings on January 7, 2007,

but that she saw only Davis actually fire a weapon. These men were not strangers to her since she had observed them around her residence engaged in the sale of drugs.

Because the Holidays knew the perpetrators only by their street names, and not their proper names, the police asked them to look at a catalog of photographs on a computer. At the police station, Mr. and Mrs. Holiday sat together in front of a computer monitor scanning photographs in the presence of a police detective. Simultaneously they spotted Davis, with Mrs. Holiday stating "there he go," to which her spouse responded "yeah." Mr. Holiday then left while Mrs. Holiday continued to look at images on the computer screen. Eventually, Mrs. Holiday identified Goode. When her husband rejoined her and saw Goode's image on the computer he said, "that's him."

At the conclusion of the Wade hearing, the court ruled that the out-of-court identifications were not tainted and were admissible. The court was not troubled by the procedure, because both Mr. and Mrs. Holiday knew the defendants prior to the shootings. Additionally, although the couple identified Davis while sitting together, neither one was leading the other. Furthermore, Mrs. Holiday's identification of Goode was separate from her husband's, and there was no testimony that she directed him to her selection when he re-entered the area and looked at the screen with multiple photographs.

In determining the admissibility of an out-of-court identification, a court must first decide whether the procedure utilized to secure the identification was impermissibly suggestive. *State v. Herrera*, 187 N.J. 493, 504 (2006). When photographs are used, the risk of improper suggestiveness is increased where the police: (1) display to the witness only the picture of a single individual who generally resembles the person described by the witness; (2) display the pictures of several persons among which the photograph of a single individual recurs or is in some way emphasized; or (3) indicate to the witness that they had other evidence indicating that one of the persons pictured committed the crime. *Simmons v. United States*, 390 U.S. 377, 383–84, 88 S.Ct. 967, 971, 19 L. Ed.2d 1247, 1253 (1968).

If the procedure is deemed to be impermissibly suggestive, the court must then decide whether "the objectionable procedure resulted in a 'very substantial likelihood of irreparable misidentification.' "*Id*. at 384, 88 S. Ct. at 971, 19 L. Ed.2d at 1253. In other words, the court must determine whether the "identification is otherwise supported by indicia of reliability" which indicate that the "identification was

prompted by the eyewitness's own recollection of the crime," and not by the suggestive identification procedure. *State v. Santoro*, 229 N.J. Super. 501, 504 (App. Div. 1988), *certif. denied*, 121 N.J. 593 (1990).

This reliability determination must be made from the totality of the circumstances in each particular case. *Herrera*, *supra*, 187 N.J. at 506. The specific factors that must be weighed against the "corrupting effect of the suggestive procedure" include the " 'opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the time of the confrontation and the time between the crime and the confrontation.' " *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L. Ed.2d 140, 154 (1977).

When the court is assured of the reliability of the identification notwithstanding the suggestive nature of the procedure by which it was obtained, the identification may be admitted into evidence. *State v. Madison*, 109 N.J. 223, 232 (1988). This is because "reliability is the linchpin in determining the admissibility of identification testimony." *Manson*, *supra*, 432 U.S. at 114, 97 S.Ct. at 2253, 53 L. Ed.2d at 154. Davis argues that the process by which his photo was selected was violative of the Attorney General Guidelines For Preparing and Conducting Photo and Live Lineup Identification Procedures (Guidelines) and highly suggestive since the Holidays viewed the photographs together and without any police supervision. Davis also insists that the identifications were not otherwise reliable since both witnesses initially reported to police that the perpetrators wore masks. Goode contends that contrary to the court's findings, the evidence presented at the Wade hearing was unequivocal that Mr. Holiday was guided to his photo by his wife, thereby establishing that the identification procedure was suggestive or tainted.

The photographs presented to the Holidays were neither inherently suggestive nor violative of the Guidelines. The police had no suspects at the time the identifications were made, but were instead attempting to link the perpetrators' formal names with their street names. The Holidays were not induced by the police to make a specific identification. Also, the record does not reflect that Mr. Holiday was guided to Goode's photograph by his wife. There was no error by the Law Division in denying defendants' Wade motion to suppress the out-of-court identifications.

*Davis*, 2012 WL 2009258, at *17–19.

An identification obtained by improper police influence is not automatically excluded. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). The Supreme Court said that "due process concerns arise only when law enforcement officers use[d] an identification procedure that is *both* suggestive and unnecessary." *Id.* at 238–39 (citing *Manson v. Brathwaite*, 432 U.S. 98, 107, 109 (1977)); *see also Sexton v. Beaudreaux*, 585 U.S. 961, 965 (2018). Prior to trial, the judge must screen the evidence for reliability. *Perry*, 565 U.S. at 232. If there is "a very substantial likelihood of irreparable misidentification[,]" *Id.* (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)), the judge must disallow presentation of the evidence at trial. *Id.* "But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.* To determine whether an identification is sufficiently reliable, courts examine the totality of the circumstances. *See Neil v. Biggers*, 409 U.S. 188, 199 (1972). In so doing, courts consider the following factors: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* at 199–200.

Here, Petitioner is not entitled to habeas relief on this claim. First, he has failed to establish that the identification procedure was suggestive. *See Perry*, 565 U.S. at 232. "It is the likelihood of misidentification which violates a defendant's right to due process." *Biggers*, 409 U.S. at 198. "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Id.* As stated by the Appellate Division, "[t]he Holidays were not induced by the police to make a specific identification." *Davis*, 2012 WL

2009258, at *17–19.  This is further supported by the record when Mr. Holiday testified at the *Wade*[10] hearing that his wife did not influence him in making an identification.  (Wade Tr., at 5T:10 to 21–24.)  He further testified that he knew the defendants, and "I don't need nobody to tell me what to do—who to select."  (*Id.*)

In addition, there is no increased likelihood of misidentification because both witnesses were familiar with Petitioner from his history of selling drugs in front of their apartment. *Davis*, 2012 WL 2009258, at* 17.  There is also no evidence that the identification was unnecessary because, as noted by the Appellate Division, "[t]he police had no suspects at the time the identifications were made, but were instead attempting to link the perpetrators' formal names with their street names." *Id.*  Petitioner has therefore failed to show that the identification procedure was both suggestive and unnecessary. *See Perry*, 565 U.S. at 232.  Accordingly, the Appellate Division's conclusion regarding this claim was not contrary to, or an unreasonable application of, Supreme Court precedent.  Ground Seven therefore will be denied.

### E.  Ground Eleven: Ineffective Assistance of Counsel Claims

In Ground Eleven, Petitioner alleges Sixth Amendment violations of the right to the effective assistance of counsel based on the following.  (Am. Pet., at 29–31.)  First, in Ground Eleven (a), Petitioner argues that trial counsel was ineffective for eliciting inadmissible hearsay evidence from Saleem Grimes that the defendants were shooting at the victims on New Year's eve. (*Id.* at 29.)  Petitioner next argues, in Ground Eleven (b), that trial counsel failed to object when the prosecutor elicited inadmissible testimony that the police had an arrest warrant for him.  (*Id.*) Next, Petitioner contends in Ground Eleven (c), that trial counsel improperly elicited testimony that police had a search warrant for his home.  (*Id.*)  Petitioner also alleges in Ground Eleven (d)

---

[10] *United States v. Wade*, 388 U.S. 218 (1967).

that trial counsel was ineffective for failure to investigate or properly prepare for his trial. (*Id.* at 30.) More specifically, Petitioner argues that he would have been acquitted had trial counsel called his alibi witnesses. (*Id.*) The Court will address each allegation in turn.

The United States Constitution guarantees the right of assistance of counsel to every person accused of a crime. U.S. Const. amend. VI. "[T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause:

> 'In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.'"

*Id.* at 684–85. To support an ineffective assistance of counsel claim under *Strickland*, a petitioner must first show counsel's performance was deficient. *Id.* at 687. "This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must show counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's

performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

A petitioner also must affirmatively demonstrate that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial ... whose result is reliable." *Strickland*, 466 U.S. at 687, 692–93; *Shedrick*, 493 F.3d at 299. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must demonstrate "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. "Because failure to satisfy either [*Strickland*] prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 697–98).

Errors that undermine confidence in the fundamental fairness of the state adjudication, including deprivation of the right to the effective assistance of counsel, justify the issuance of the federal writ of habeas corpus. *Taylor*, 529 U.S. at 375. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). *Harrington*, 562 U.S. at 105. When Section 2254(d) applies, "the question is not whether counsel's actions were reasonable" rather the question is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* More specifically, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was

unreasonable." *Id.* at 101.  "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.*  "Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court." *Id.*

> a.  **Ground Eleven (a): The introduction of inadmissible evidence of a prior shooting Petitioner was alleged to have been involved in**

In Ground Eleven (a), Petitioner argues that trial counsel was ineffective for eliciting inadmissible hearsay evidence from Saleem Grimes that the defendants were shooting at the victims on New Year's eve.  (Am. Pet., at 29.)  On cross-examination, counsel elicited the following testimony from Saleem Grimes:

> Q: And not—okay.  Now, you had told us that—that on New Year's Eve, that it was around the time that the ball dropped that you were talking to Saad—to Samad on the telephone; is that right?
>
> A: Saad.
>
> Q: Saad. Is that right?
>
> A: Yes.
>
> Q: And you said you knew the ball dropped, and then you heard gunshots.
>
> A: Yes.
>
> Q: Now, that was on New Year's Eve?
>
> A: December 31st, that's the party. New Year's Eve would be New Year—New Year's Eve is the 31st, and New Year's would be the 1st. After the ball dropped. That's 12:00.
>
> Q: Right. So, when you're talking about hearing gunshots, that had nothing to do with the day that the—you say that your cousin and your—and the other boy were killed?
>
> A: I didn't say that.

(Trial Tr., at 6T:61–9 to 62–2.)

Petitioner raised this claim during his direct appeal.  (Pet'r's Direct Appeal Br., at 80–83.)

However, the Appellate Division rejected this claim, determining that Petitioner's claims of

ineffective assistance of counsel are best left to post conviction review. *See Davis*, 2012 WL

2009258, at *19.   Petitioner subsequently raised this argument in his petition for post-conviction

relief.  (Pet'r's PCR, at 85–92.)  The PCR court denied relief.  (Nov. 18, 2014 Order, at 120.)  On

appeal therefrom, (Pet'r's' PCR Appeal, ECF No. 11-29), the Appellate Division  found this claim

to be of insufficient merit to require discussion in a written opinion. *See Davis*, 2017 WL 444295,

at *5.   Petitioner appealed to the New Jersey Supreme Court, which denied certification. *See*

*Goode/Davis*, 170 A.3d at 316; *see also Goode/Davis*, 170 A.3d at 318.

*Strickland* is the clearly established federal law that applies to this claim.   Under

the *Strickland* test, Petitioner must show counsel's performance was deficient and that there would

be a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding

would have been different.  *Strickland*, 466 U.S. at 694.  The Third Circuit has held that irrelevant

testimony that is damaging to a defendant constitutes ineffective assistance of counsel where

petitioner's attorney continued to pursue a prejudicial line of questioning despite the trial court's

efforts to shield the jury from the prejudicial effects of the witness testimony as to petitioner's

unrelated robbery/homicide investigation.  *See Berryman v. Morton*, 100 F.3d 1089, 1100 (3d Cir.

1996).

Here, Petitioner contends that there could be no strategic reason for counsel to elicit this

line of questioning.  (Am. Pet., at 29.)  However, even if trial counsel's performance was deficient

for pursuing a line of questioning that opened the door to inadmissible hearsay, Petitioner fails to

demonstrate *Strickland* prejudice.  Specifically, Petitioner fails to show if trial counsel had never

pursued that line of questioning, how that would have persuaded the jury to arrive at a different

conclusion.  In light of the Supreme Court's holding in *Strickland*, Petitioner cannot demonstrate

that the Appellate Division's decision was contrary to, or involved an unreasonable application of,

clearly established federal law.  Therefore, the Court will deny habeas relief on Ground Eleven

(a).

### b. Ground Eleven (b): The failure to object when the State elicited testimony that police had an arrest warrant for him

Petitioner next argues, in Ground Eleven (b), that trial counsel failed to object when the

prosecutor elicited inadmissible testimony that the police had an arrest warrant for him.  (Am.

Pet.,. at 29.)  The following testimony of Detective James was elicited by the prosecutor on direct:

> Q: All right. You can place that down. Now, after all witness
> statements were taken and after all, umm, identification procedures
> were concluded, did you, in fact, obtain arrest warrants for the
> defendants in this case?
>
> A: Yes, warrants were obtained.
>
> . . .
>
> Q: And at the time, were you making efforts to arrest Darryl Davis
> and Quantis Goode?
>
> A: Yes.
>
> Q: All right.
>
> > Mr. Sukhdeo: Could I just be heard at side bar, briefly,
> > Judge?
> >
> > The Court: Yes, I'll hear you.
>
> (Sidebar discussion out of the Jury's presence.)
>
> > The Court: Mr. Sukhdeo.
> >
> > Mr. Sukhdeo: I have two warrant notices they issued during
> > this event to try to – I'm not going to show you in front of
> > the Jury. It was used during the course of them trying to

apprehend. It would be improper to have them before the Jury, but I think it's proper to ask questions.

I have S86 –

The Court: Don't tip them that way.

Mr. Sukhdeo: S86 and 85 here, warrants noted that the Newark Police issue regularly in homicide cases when looking for suspects as part of the investigation – part of the attempt to make the arrest in this case.

I don't think it would be proper to have these admitted into evidence, formally, before the Jury, but I do intend to asking this witness questions about how these were issued in his attempt to make the arrest.

Mr. Goldman: I'm sorry?

The Court: Mr. Bashir? Mr. Goldman? I don't care who.

Mr. Goldman: I think this is clearly an afterthought, solely here to inflame and to prejudice, as opposed to bring forth information about the shooting.

What they did after in trying to catch these people doesn't matter, unless they have some proof of flight, which they don't. I don't see why they're admissible if they don't.

. . .

Mr. Goldman: Both turned themselves in. Goes to complete this investigation. The fact that these people were present in Baxter Terrace all the time, and then now they're not present, and then they want to know what the police did, actually, in trying to effectuate the arrest.

Mr. Sukhdeo: The arrest is a substantial part of any investigation, Judge. The Jury generally wants to know where the police go to complete this investigation. When counsel is summing up, they're going to say, what did the police do, what did they do, what procedures did they follow, why did they file this. I want the whole range of investigation I want to get before this Jury, including the arrest.

The Court: Mr. Sukhdeo, I will allow you to ask him what was done to effectuate the arrest on the warrant. One, I don't

know that you need to show him two wanted posters.

Mr. Sukhdeo: Okay.

The Court: What they are. Clearly ask him what was done to attempt to effect the warrants that were issued. I will allow that.

Mr. Sukhdeo: Okay, thank you Judge.

(Trial Tr., at 9T:95–19 to 98–15.)

As an initial matter, Respondents urge this Court to bar consideration of this claim on the basis that it was not exhausted in State court because Petitioner did not raise this claim in his certification to the Supreme Court of New Jersey. (Resp't's Suppl. Answer, at 4.) In the alternative, Respondents argue that this claim is meritless because trial counsel did object to admission of this evidence, which resulted in the trial court limiting what the prosecutor could elicit regarding the arrest warrants for Petitioner. (*Id.*) In his supplemental traverse, Petitioner disputes Respondents' claim that Ground Eleven (b) is unexhausted. (Pet'r's Suppl. Reply, at 10.) Specifically, Petitioner contends that he raised eleven different claims in his direct appeal, thus, his petition for certification to the New Jersey Supreme Court had to include each claim. (*Id.* at 11.) The Court need not decide whether Petitioner raised this claim in his certification to the Supreme Court of New Jersey because it fails under *de novo* review.

Under the AEDPA a district court may not grant a writ of habeas corpus under 28 U.S.C. § 2254 unless the petitioner has exhausted the remedies available in the courts of the State or exhaustion is excused under 28 U.S.C. § 2254(b)(1)(B). *See Henderson v. Frank*, 155 F.3d 159, 164 (3d Cir. 1998); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997); *Toulson v. Beyer*, 987 F.2d 984 (3d Cir. 1993). To meet the exhaustion requirement, a petitioner must "fairly present" his federal claims to each level of the state courts empowered to hear them, either on direct appeal

or in collateral post-conviction proceedings. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999). "The exhaustion requirement ensures that state courts have the first opportunity to review convictions and preserves the role of state courts in protecting federally guaranteed rights." *Lines v. Larkins*, 208 F. 3d 153, 159 (3d Cir. 2000) (citing *Caswell v. Ryan*, 953 F.2d 853, 856 (3d Cir.1992)). The petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts [the state courts] on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999). A habeas court may deny an unexhausted claim on the merits, when appropriate. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where the state courts have not "reached the merits of a claim thereafter presented to a federal habeas court," the federal court must "conduct a *de novo* review over pure legal questions and mixed questions of law and facts . . ." *Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007). On *de novo* review of a habeas claim, the state court's factual determinations are still presumed to be correct unless the petitioner rebuts them with clear and convincing evidence. *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).

As noted above, to prevail on this claim, Petitioner must demonstrate that his counsel's performance was deficient and prejudicial to his defense. *Strickland*, 466 U.S. at 687. "Counsel is presumed to be competent and the defendant has the burden of proving otherwise." *Werts v. Vaughn*, 228 F.3d 178, 205 (3d Cir. 2000). Here, Petitioner argues that counsel's failure to object to testimony that police had obtained a warrant for his arrest severely prejudiced his right to a fair trial. (Am. Pet., at 29.) The Court disagrees. First, the questioning elicited by the prosecutor, that an arrest warrant was issued for Petitioner, was fair based on the evidence presented at trial, thus,

not improper. "If the remarks themselves are not improper, counsel cannot be held ineffective for failing to object to them." *Werts*, 228 F.3d at 205. Additionally, the record reflects that counsel met at sidebar and Petitioner's attorney made arguments against the admission of the arrest warrants into evidence as inflammatory and prejudicial. (*See* Trial Tr., at 9T:96–5 to 98–14.) For these reasons, Petitioner fails to demonstrate that counsel's performance was deficient. *See Harrington*, 562 U.S. at 105. Accordingly, the Court will deny Ground Eleven (b) on the merits.

### c. Grounds Eleven (c): Trial counsel failed to object and improperly elicited testimony that the police had a search warrant for Petitioner's home

Petitioner contends in Ground Eleven (c) that he was prejudiced when trial counsel improperly elicited testimony that police had a search warrant for his home. (Am. Pet., at 29.) During trial, the judge ordered the attorneys to sidebar and expressed concern that counsel's line of questioning exceeded the scope of direct when he asked the witness about a search warrant. (*See* Trial Tr., at 9T:112–23 to 113–9.) The court ruled that counsel was permitted to continue after counsel indicated that such testimony was being elicited to show that the police conducted a search of Petitioner's last known address and found no incriminating evidence. (*Id.* at 9T:113–16 to 115–11.)

Petitioner raised this claim during his direct appeal, (Pet'r's Direct Appeal Br., at 83–85), and in summary fashion in his petition for post-conviction relief. (Pet'r's PCR, at 20.) After the PCR court denied relief, (Nov. 18, 2014 Order, at 120), the Appellate Division found the claim to be of insufficient merit to require discussion in a written opinion. *See Davis*, 2017 WL 444295, at *5. The New Jersey Supreme Court denied certification. *See Goode/Davis*, 170 A.3d at 316; *see also Goode/Davis*, 170 A.3d at 318.

When a state court decision on the merits is unaccompanied by a statement of reasons, the Supreme Court has held that a district court should "look through" the unexplained decision to the

last related state court decision that does provide a relevant rationale. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). "[The district court] should then presume that the unexplained decision adopted the same reasoning." *Id.* Here, the PCR court was the last related state court decision that provided a rationale for denying this claim. Therefore, this Court will presume that the Appellate Division adopted the same reasoning. The PCR court analyzed Petitioner's claim as follows:

> The next argument appears to be that defense counsel failed to object when Detective James testified that he obtained a warrant for defendant's arrest and improperly elicited testimony from Detective James that he obtained a search warrant. In the circumstances, with all of the evidence having been presented and the fact that obviously there were identifications made, the testimony in and of itself is -- is appropriate. It's not inappropriate, it's not inadmissible and the comment about a search warrant and the circumstances in light of the fact that by the time the -- all of the testimony is in, the context is appropriate. There's no error there at all and that's a matter that properly could have been raised on appeal and apparently was not raised. It reasonably could have been.

(PCR Tr., 18T11:7–23.)

The Appellate Division's decision was not an unreasonable application of *Strickland*. Any set of rules imposing an exhaustive list for judicial evaluation of attorney performance "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688–89 (citing *United States v. Decoster*, 624 F.2d 196, 208 (D.C. Cir. 1976)). Strategic decisions are entitled to a "strong presumption" of reasonableness. *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (citing *Harrington*, 562 U.S. at 104). "Defense lawyers have "limited" time and resources, and so must choose from among "'countless'" strategic options. *Id.* (citing *Harrington*, 562 U.S. at 106–07)). "Such decisions are particularly difficult because certain tactics carry the risk of "harm[ing] the defense" by undermining credibility with the jury or distracting from more important issues." *Id.* (citing *Harrington*, 562 U.S. at 108)). Respondent bears the burden of

rebutting this presumption, and a district court may not grant relief if "[t]he record does not reveal" that counsel took an approach that no competent lawyer would have chosen. *Reeves*, 594 U.S. at 739 (quoting *Burt v. Titlow*, 571 U.S. 12, 22–23 (2013)). This analysis is "doubly deferential" when, as here, a state court has decided that counsel performed adequately. *See Burt*, 571 U.S. at 15.

Petitioner has provided no basis to support his contention that counsel was deficient for pursuing a line of questioning as to the basis for the search warrant. The record reveals that this was a strategic decision on the part of counsel which is afforded a "strong presumption of reasonableness." *See Reeves*, 594 U.S. at 739. At sidebar, counsel explained his reasoning for this line of questioning as follows:

> THE COURT: Counsel, there has been no testimony about them getting a search warrant.
>
> MR. GOLDMAN: The police report shows they got one.
>
> THE COURT: I'm sorry.
>
> MR. GOLDMAN: Police report shows they got one. It's cross-examination.
>
> THE COURT: You don't have to limit yourself to what's in direct, Mr. Goldman?
>
> MR. GOLDMAN: I don't think so. I don't think so. I can – you mean to tell me if a witness testifies that I saw him shoot this person, and that's the only thing he says, and there's 10 pages of reports, I can't go into the reports, the things he didn't testify to?
>
> THE COURT: That's direct. You can call him as your witness, if you want, to talk about something else, but my understanding of the law requires you to limit your cross-examination to the scope on direct.
>
> MR. GOLDMAN: Except the defendant is entitled to wide latitude on cross-examination.

THE COURT: Okay. So what's this? Since I don't know anything about a search warrant.

MR. GOLDMAN: The prosecutor made this big thing about how they looked and tried to find this guy.

THE COURT: Okay.

MR. GOLDMAN: Also got a search warrant. I want to find out if they found anything.

THE COURT: Search warrant for whom, for what?

MR. GOLDMAN: That was my question.

THE COURT: I want to know before you ask the question, Mr. Goldman.

MR. GOLDMAN: You're asking me now?

THE COURT: Yeah.

MR. GOLDMAN: They're saying they got a search warrant to search the premise of Darryl Davis. It's in the police report.

THE COURT: You don't mind if I ask him if he wants to respond, do you, Mr. Goldman?

MR. GOLDMAN: No, sir.

THE COURT: Thank you.

. . .

THE COURT: I'll allow you to go into that, Mr. Goldman.

MR. GOLDMAN: Thank you.

(Trial Tr., at 9T:113–1 to 115–11.)

This exchange demonstrates counsel's deliberate trial strategy.  Counsel was able to cogently explain his reasons for pursuing this line of questioning, which apparently was to highlight that no incriminating evidence was located at Petitioner's place of residence.  As the Appellate Division's findings were not contrary to or an unreasonable application of federal law,

and as Petitioner has failed to make out ineffective assistance of counsel, this claim fails to set forth a valid basis for habeas relief and will be denied.

### d. Trial Counsel's failure to perform an investigation

Petitioner contends that he was prejudiced when trial counsel failed to prepare for trial or call alibi witnesses. (Am. Pet., at 30.) Respondents claim that the record demonstrates a complete and comprehensive defense. (Resp't's Answer, at 95.) Respondents further argue that Petitioner has failed to supply names or documentation as to the alibi witnesses or how their testimony would have led the jury to a different result. (*Id.*)

Petitioner raised this claim on appeal from the PCR court's denial of his petition for post-conviction relief. (Pet'r's PCR Appeal, at 20.) The Appellate Division considered the claim and found it to be of insufficient merit to require discussion in a written opinion. *See Davis*, 2017 WL 444295, at *5. The New Jersey Supreme Court denied certification. *See Goode/Davis*, 170 A.3d at 316; *see also Goode/Davis*, 170 A.3d at 318.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "[T]rial counsel [i]s not bound by an inflexible constitutional command to interview every possible witness. Instead, counsel [i]s simply required to exercise reasonable professional judgment in deciding whether to interview [a witness]." *Moore v. DiGuglielmo*, 489 F. App'x 618, 625 (3d Cir. 2012) (quoting *Lewis v. Mazurkiewicz,* 915 F.2d 106, 113 (3d Cir.1990)).

As previously noted, in order to demonstrate that the absence of a witness prejudiced his or her case, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694)). Here, Petitioner fails to meet that burden. Petitioner alleges that "witnesses who would

have exonerated petitioner and support his alibi defense were not presented to the jury." (Am. Pet., at 30.) However, defense counsel testified at the PCR hearing that he investigated possible defenses. (PCR Tr., at 19T42: 2–4.) Petitioner's bald allegations, evaluated in light of the totality of the circumstances, are insufficient to show a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694; *see also Zettlemoyer v. Fulcomer*, 923 F.3d 284, 298 (3d Cir. 1991); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006).

Petitioner fails to provide any details about these purported alibi witnesses, including names, availability for trial, or potential testimony that the witnesses would provide. Accordingly, the Appellate Division's decision was neither contrary to, nor an unreasonable application of the *Strickland* standard. Petitioner's claims that counsel was unprepared are likewise without merit. Accordingly, the Court will deny habeas relief on this claim.

## F. Grounds Twelve & Thirteen:  Trial Counsel's Ineffectiveness Regarding the Plea Offer

In Ground Twelve, Petitioner argues that trial counsel was ineffective for failing to review the strengths and weaknesses of the case before he formally rejected the plea offer. In Ground Thirteen, Petitioner alleges that he was prejudiced by the more severe prison term that was imposed after he was found guilty at trial despite potentially wanting to plead guilty to a lesser term. (Am. Pet., at 31–46.)

### 1. Ground Twelve

Petitioner asserts Sixth Amendment and state law violations in Ground Twelve based on his rejection of the "generous plea offer"[11] based on the advice of his attorney. (Am. Pet., at 31.)

---

[11] Although there was no formal plea offer, Petitioner contends that the parties engaged in negotiations up to the day of trial. (*See* Am. Pet., at 34.) At some point, there was an informal discussion of a 14 year NERA plea offer to a guilty plea to reckless manslaughter. (*Id.*, at 33.)

Specifically, Petitioner contends that counsel cited to the weakness of the State's case as a basis to justify rejection of the plea agreement. (*Id.*) Petitioner also contends that his attorney did not fully explain the ramifications of proceeding to trial, and that he did not have the benefit of a pretrial memorandum, nor was he advised of pre-trial cut off as required by the New Jersey Court Rules.[12] (*Id.*) Trial counsel testified as follows at the PCR hearing:

> Q: Now you represented Darryl Davis in this homicide; correct?
>
> A: That is correct.
>
> Q: And he's seated here in the courtroom; right?
>
> A: Yes, he is.
>
> Q: And you remember specifically providing him with the discovery in this case?
>
> A: Yes, I did.
>
> Q: And you discussed the proofs and trial strategy of the facts of the case and whether -- you know, the strengths and the weaknesses?
>
> A: Yes, I did.

(PCR Tr., at 19T41:4–15.)

Petitioner raised this claim on both of his PCR appeals. (*See* Pet'r's PCR Appeal, at 5–18; *see also* Pet'r's Second PCR Appeal, at 18–28.) With respect to the first appeal, the Appellate Division analyzed the claim and found it to be without sufficient merit to warrant discussion in a written opinion. *See Davis*, 2017 WL 444295, at *5. In the second PCR appeal, the court affirmed denial of the PCR for substantially the reasons expressed by the PCR judge. *See Davis*, 2022 WL 533741, at *1. The Appellate Division analyzed the claim under *Strickland* and added the following additional remarks:

---

[12] New Jersey Court Rule 3:9-1(f).

The PCR judge found credible the assistant prosecutor and co-defendant's trial counsel, who corroborated that the State did not make either defendant an offer to plead guilty. The PCR judge explained that the documentary evidence—the pre-trial memoranda—corroborated that no offer was made. He rejected testimony from defendant's trial counsel that a few days before the trial, it is possible that the State may have given defendant the opportunity to plead guilty. The PCR judge found that such testimony about a possible plea offer "strains credulity." He also found that defendant's testimony, which "parroted" co-defendant's testimony, was "questionable" and that defendants had the opportunity to collaborate about their testimony before the evidentiary hearing.

Importantly, if there had been an offer (which is not the case), the PCR judge found that defendant "sidestepped" answering whether he would have pled guilty if given the opportunity to do so. According to the PCR judge, defendant's unwillingness to "give a forthright" answer is consistent with defendant's position that he was not guilty. The PCR judge characterized defendant's testimony as evasive and pointed out in his written opinion that "even at the time of the evidentiary hearing, [defendant] did not express his willingness to say he killed the two male victims" and that he was unwilling to "inculpate his co-defendant in the crime."

To establish a prima facie claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test enumerated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which our Court adopted in *State v. Fritz*, 105 N.J. 42, 58 (1987). To meet the first *Strickland/Fritz* prong, a defendant must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. The defendant must rebut the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id*. at 689. Thus, we consider whether counsel's performance fell below an objective standard of reasonableness. *Id*. at 687-88. Having done so, defendant is unable to demonstrate the first prong of the *Strickland* test.

To satisfy the second *Strickland/Fritz* prong, a defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "[I]f counsel's

performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." *Fritz*, 105 N.J. at 58. In the context of plea offers, "a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). He fails to meet the second prong as well.

As to defendant's contentions on appeal, he must "do more than make bald assertions that he was denied the effective assistance of counsel." *State v. Cummings*, 321 N.J. Super. 154, 170 (App. Div. 1999). It is settled that a defendant bears the burden of establishing a prima facie claim of ineffective assistance of counsel. *State v. Gaitan*, 209 N.J. 339, 350 (2012). Here, on this record, defendant cannot establish such a prima facie claim because his arguments also amount to bald assertions.

*Davis*, 2022 WL 533741, at *1–2.

As a preliminary matter, the Court will deny the claim to the extent that it alleges a violation of state law. *See Estelle*, 502 U.S. at 67–68 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law' (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

The Court turns to Petitioner's allegations of Sixth Amendment violations. Specifically, Petitioner alleges that he rejected a plea offer upon advice of counsel and was prejudiced by a harsher sentence after a loss at trial. (Am. Pet., at 31–46.) The Supreme Court has held that the Sixth Amendment right to counsel extends to the plea-bargaining process. *Missouri v. Frye*, 566 U.S. 134, 144 (2012). During plea negotiations defendants are "entitled to the effective assistance of competent counsel." *Lafler v. Cooper*, 566 U.S. 156, 162   (2012) (citing *McMann v. Richardson,* 397 U.S. 759, 771 (1970)).

The Appellate Division determined that Petitioner was unable to establish a prima facie claim for ineffective assistance of counsel because his arguments amount to bald assertions. *See Davis*, 2022 WL 533741, at *2.  This decision was neither contrary to, nor an unreasonable

application of the *Strickland* standard.  First, Petitioner has failed to establish that counsel's performance was deficient. As previously stated, deficient performance requires a petitioner to show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*  In light of evidence in the record that establishes no formal plea offer was ever extended to Petitioner, this Court has no basis to find that counsel was ineffective for discouraging Petitioner's acceptance of a non-existent plea offer.

Second, even if counsel was deficient for advising Petitioner to reject the plea offer, Petitioner's claim fails because he is unable to establish *Strickland* prejudice.  In the context of pleas, a defendant must show the outcome of the plea process would have been different with competent advice. *See Frye*, 566 U.S. at 148 (noting that *Strickland*'s inquiry, as applied to advice with respect to plea bargains, turns on "whether 'the result of the proceeding would have been different'" (quoting *Strickland*, 466 U.S. at 694)).

Petitioner fails to show that the outcome of the plea process would have been different because there was no formal plea offer.  Moreover, counsel testified at the PCR hearing that there was no counter-offer because Petitioner maintained his innocence from the beginning.  (PCR Tr., at 19T42:5 to 43:5.)  There is also nothing in the record to suggest the prosecutor would have formally offered such a plea or that the court would have accepted it.  As such, Petitioner cannot establish *Strickland* prejudice. The Appellate Division's decision was not an unreasonable application of *Strickland*.  Accordingly, the Court will deny this claim.

### 2.  Ground Thirteen

In Ground Thirteen, Petitioner asserts Fifth and Fourteenth Amendment[13] due process

---

[13] Petitioner raises these claims under the Fifth and Fourteenth Amendment.  However, ineffective assistance of counsel claims fall under the Sixth Amendment.  *See Cullen v. Pinholster*, 563 U.S. 170, 189 ("the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants

violations based on trial counsel's deficiencies as follows.  First, trial counsel was not divested of responsibility for advising Petitioner to forego plea negotiations based on Petitioner maintaining his innocence of crimes charged.  (Am. Pet., at 36.)  Second, Petitioner's assertion that he was not guilty is not equivalent to an assertion that he would lie under oath to plead guilty.  (*Id.*)

The Appellate Division remanded for an evidentiary hearing after Petitioner filed an appeal from the PCR court's denial of his petition. *See Davis*, 2017 WL 44295, at *5.  At the hearing, trial counsel provided the following testimony with respect to this claim:

> Q: And did you discuss plea negotiations with your client?
>
> A: Only -- only a few days before trial.
>
> Q: And did you discuss a specific number with him?
>
> A: I advised him that the prosecutor had offered him a plea to a downgrade reckless manslaughter. And they were offering him 14 years.
>
> Q: Did you ever receive a formal plea offer, like a -- you know, a written or a typed up plea offer from the State?
>
> A: I don't recall. I don't have a file if it's more than seven years.
>
> Q: Do you remember talking with anyone else in the Prosecutor's Office about this number -- 14 years or this plea offer?
>
> A: I think it was just with Romesh. And I think that there was a young lady who tried the case with him.
>
> Q: Was she also a prosecutor?
>
> A: Yes.
>
> Q: After discussing the plea offer with your client, did you have additional communications with Mr. Sukhdeo about that number?
>
> A: No, there was no counteroffer. Mr. -- Mr. Davis had told me right

---

receive a fair trial") (quoting *Strickland*, 466 U.S. at 689)).  However, *pro se* habeas petitions are construed liberally. *See Royce*, 151 F.3d at 118.  Therefore, the Court will analyze these claims under the Sixth Amendment.

from the beginning that he was not guilty.

Q: So he wasn't interested in accepting a plea offer?

A: Well that's not true. He -- when I told him the offer, he said that he thought that he -- that he should take the offer even though he was not guilty because he would -- didn't want to expose himself to the possibility of going to jail for the rest of his life.

Q: What did you say in response to him when he said that to you?

A: What was my response when -- when he said that to me?

Q: Yes.

A: I can't recall. I -- I mean I know generally that I told him I thought that the State's case was very weak. That there was -- main testimony in the case that said that the person who was supposed to be Darryl had run quickly from the scene. And I knew that, that was impossible because Darryl had recently gotten a -- a -- a new leg. He had injured himself in a motorcycle accident. And he didn't -- and he couldn't run at all.

(PCR Tr., at 19T42:5 to 44:1.)  Counsel also testified that he did not remember if he received a formal plea offer signed by Prosecutor Paula Dow.  (*Id.* at 19T44:13–23.)

Petitioner raised this claim to the Appellate Division in his second PCR appeal.  (Pet'r's Second PCR Appeal, at 7–15.)  However, it is unclear whether this claim was exhausted with the New Jersey Supreme Court.  (ECF No. 42.)  As previously stated, in order to meet the exhaustion requirement, a petitioner must "fairly present" his federal claims to each level of the state courts empowered to hear them, either on direct appeal or in collateral post-conviction proceedings.  *See O'Sullivan*, 526 U.S. at  847 (1999).  Nevertheless, the Court need not determine whether this claim was raised to the Supreme Court because it fails under *de novo* review pursuant to 28 U.S.C. § 2254(b)(2).

The Sixth Amendment right to the effective assistance of counsel does not attach to all aspects of negotiation between defense counsel and prosecutor. *United States v. Tarnai*, 782 F.

App'x 128, 131 (3d Cir. 2019). "Its protections are triggered by formal offers." *Id*. "In the plea-bargaining context, the defendant must first establish a reasonable probability that the plea agreement would have been consummated." *Id.* (citing *Frye*, 566 U.S. at 147)). A "reasonable probability" means: (1) "the defendant would have accepted the plea," (2) "the prosecution would not have withdrawn it in light of intervening circumstances," and (3) "the court would have accepted its terms." *Id.* (quoting *Lafler*, 566 U.S. at 164)). The defendant must then "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Id.* (quoting *Frye*, 566 U.S. at 147)).

As previously noted, under *Strickland*, Petitioner must show counsel's performance was deficient and that there would be a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Here, Petitioner cannot establish that he was prejudiced by trial counsel's conduct. It is not enough that Petitioner claims he would have accepted a fourteen-year plea offer. He must also show that the prosecutor and court would have accepted the agreement—a feat that is unlikely given that no formal offer was extended. Petitioner also cannot establish prejudice because he did not express a willingness to provide a factual basis that he killed two men as a predicate for entering a guilty plea. (Mar. 31, 2020 PCR Opinion, ECF No. 11-37, at 62.) For those reasons, Petitioner cannot establish a *Strickland* claim. Accordingly, the Court will deny this claim on the merits.

### G. Ground Fourteen: Trial counsel was ineffective for not objecting to the jury's access to statements during deliberations

In Ground Fourteen, Petitioner claims that trial counsel was ineffective for failing to object when the jury was allowed replays of Mr. Holiday's and Mr. Alston's recorded statements. (Am. Pet., at 46–47.) Petitioner argues that he was prejudiced by the jury's "unfettered access" to the

recordings while in the jury room because the jury was unmonitored and there is a risk the video-recorded statements were overemphasized.  (*Id.* at 46.)  Petitioner additionally argues that the video replay is a "critical stage" of the proceeding where he had a right to be present.  (*Id.*)

Petitioner raised this claim in his first PCR appeal, (Pet'r's PCR, at 17–20), and in his petition for certification to the Supreme Court of New Jersey, (ECF No. 11-32, at 5–8), which was denied.  *See Goode/Davis*, 170 A.3d at 316; *see also Goode/Davis*, 170 A.3d at 318.

The Appellate Division considered Petitioner's claim in light of controlling law as follows:

> Defendants fail to offer any explanation as to how the jury's access to the audiotapes prejudiced them. They do not allege that any portion of the Holiday tape given to the jury was not previously played in front of the jury. Defense counsel specifically agreed to the submission of Holiday's audiotape for strategic reasons: to allow the jury to hear for itself the inconsistencies between Holiday's prior statement and his trial testimony. At the time the audiotape was given to the jury, videotapes were not allowed to go to into the jury room if read-back testimony was requested by the jury. *State v. Burr*, 195 *N.J.* 119, 134–35 (2008). The general prohibition against all recordings, including audiotapes, going into the jury room unsupervised had not yet been articulated. *State v. A.R.*, 213 *N.J.* 542, 560–61 (2013) (including audiotapes and finding harmless error when pretrial videotaped statements of the defendant and victim did go into jury room with consent of defense counsel).

*Davis*, 2017 WL 444295, at *5.

Respondents argue it was a reasonable strategic decision to let the jury hear the inconsistencies in the witness statements with hopes it would lead to reasonable doubt.  (Resp't's Suppl. Answer, at 11.)  Respondents further argue that this claim does not raise a constitutional issue because it is based on a New Jersey rule.  (*Id.*)  In reply, Petitioner asserts that the jury's "unfettered access" to the recorded statements "outside of the confines of the courtroom" prejudiced him in violation of the Due Process Clause of the Fourteenth Amendment.  (Pet'r's Reply, at 90.)

Here, Petitioner has not cited, and this Court has failed to locate any United States Supreme Court precedent concerning allowing a jury access to items admitted into evidence. *See* 28 U.S.C. § 2254(d)(1). The Third Circuit has held that trial courts have "considerable discretion in the handling of exhibits . . . during jury deliberations." *Blank v. Administrator New Jersey State Prison*, 851 F. App'x 287, 289 (3d Cir. 2021) (quoting *United States v. Burrell*, 963 F.2d 976, 982, 983 (7th Cir. 1992)).

More importantly, Petitioner's claims are based entirely on state law. (*See* Pet'r's Reply, at 89–94.) The Appellate Division applied only state law in resolving these claims. *See Davis*, 2017 WL 444295, at *5. Moreover, Petitioner generally alleges Due Process violations without citing to United States Supreme Court precedent. (*See* Pet'r's Reply, at 90.) Claimed "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).

In the absence of Supreme Court precedent on this issue, the Court cannot conclude that the Appellate Division's decision was contrary to, or an unreasonable application of clearly established federal law. Accordingly, this claim will be denied.

### H. Ground Fifteen: Trial counsel's errors regarding trial testimony

In Ground Fifteen, Petitioner claims that trial counsel was ineffective for the following reasons: (a) trial counsel was ineffective for eliciting hearsay testimony from a State's witness regarding a prior shooting; (b) trial counsel was ineffective for eliciting testimony from a Newark police detective that there was a search warrant for Petitioner's home; (c) trial counsel was ineffective for not objecting to the Newark detective's testimony regarding an arrest warrant for Petitioner. (Am. Pet., at 48–49.)

In response to Ground Fifteen, Respondents contend that "[t]hese are recycled and

repackaged claims raised in the original petition." (Resp't's Suppl. Answer, at 12.) Accordingly, Respondents will rely on their original answer. (*Id.*)

The Court will first address Petitioner's unexhausted claim in Ground Fifteen (c) that alleges counsel was ineffective for not objecting to police testimony that there was a warrant for his arrest. (Am. Pet., at 48.) This argument is identical in substance to Petitioner's argument in Ground Eleven (b) and, for the same reasons, will be denied on the merits under the *de novo* standard of review. As previously stated, a habeas court may deny an unexhausted claim on the merits, when appropriate. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). As in Eleven (b) above, the Court finds that Petitioner fails to establish that counsel's performance was deficient under *Strickland* because the questioning elicited by the prosecutor, that an arrest warrant was issued for Petitioner, was fair based on the evidence presented at trial, thus, not improper. Moreover, the record reflects that counsel met at sidebar and Petitioner's attorney made arguments against the admission of the arrest warrants into evidence as inflammatory and prejudicial. (*See* Trial Tr., at 9T:96–5 to 98–14.) For these reasons, Petitioner fails to demonstrate that counsel's performance was deficient. *See Harrington*, 562 U.S. at 105. Accordingly, the Court will deny Ground Fifteen (c) on the merits.

With respect to the exhausted claims raised in Fifteen (a) and (b), which are identical to Grounds Eleven (a) and (c) above, the Court relies on its previous analysis in determining that Petitioner fails to demonstrate that the Appellate Division's decision was contrary to, or involved an unreasonable application of, clearly established federal law. Habeas relief is denied with respect to these claims.

**I.  Ground Sixteen: Trial Counsel's Failure to Advise Petitioner of Advantages of Testifying**

In Ground Sixteen, Petitioner asserts a due process violation pursuant to the Fifth and Fourteenth Amendments[14] based on trial counsel's ineffectiveness by failing to properly advise him of the advantages of testifying on his own behalf.  (Am. Pet., at 50–51.)  Petitioner specifically alleges that he wanted to testify at trial but was advised by counsel that he should not testify because the case was going well.  (*Id.* at 50.)

Respondents argue that Ground Sixteen is unexhausted because it was not articulated in any of Petitioner's state court filings.  (Resp't's Suppl. Answer, at 13.)  Respondents alternatively argue that Petitioner's claim is without merit because the trial court ensured he knew about his right to testify, and that the decision was his alone to make.  (*Id.*)

As previously stated, in order to meet the exhaustion requirement, a petitioner must "fairly present" his federal claims to each level of the state courts empowered to hear them, either on direct appeal or in collateral post-conviction proceedings.  *See O'Sullivan*, 526 U.S. at 847 (1999).  Here, it does not appear that Petitioner raised this claim in any state court, and thus the claim is unexhausted.  Nonetheless, the Court will analyze the claim *de novo* pursuant to 28 U.S.C. § 2254(b)(2).

Criminal defendants have a constitutional right to testify at their own trial. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987).  "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Harris v. New York*, 401 U.S. 222, 225 (1971).  A defendant has the ultimate authority to determine whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal. *Florida v. Nixon*, 543 U.S. 175, 187 (2004). Concerning those

---

[14] The Court will analyze this claim under the Sixth Amendment. *See Cullen v. Pinholster*, 563 U.S. 170, 189.

decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action. *Id.*

Here, Petitioner contends that counsel coerced him not to testify on his own behalf. (Am. Pet., at 50.) Specifically, Petitioner alleges that counsel informed him that it "was a certainty that he would be convicted had he testified." (*Id.*) Petitioner's allegations fail to establish that counsel's performance was deficient. Counsel was required to consult with Petitioner concerning his decision to testify, and it was his opinion that Petitioner's testimony would not be beneficial. *See Florida v. Nixon*, 543 U.S. at 187. Moreover, counsel was also required to honor Petitioner's decision regarding whether Petitioner would testify on his own behalf. *Id.* "An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Strickland,* 466 U.S. at 688. Counsel's performance was not constitutionally deficient, and Petitioner has also failed to establish how his testimony would have affected the outcome of trial. *Id.* For these reasons, Petitioner failed to establish a *Strickland* claim, and this claim is denied on the merits.

## III. <u>CERTIFICATE OF APPEALABILITY</u>

This Court must next determine whether a certificate of appealability should issue. *See* Third Circuit Local Appellate Rule 22.2. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Unless a circuit justice or judge issues a certificate of

appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. 28 U.S.C. § 2253(c).

For the reasons discussed above, this Court's review of the claims advanced by Petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue. Therefore, the Court declines to issue a certificate of appealability. 28 U.S.C. § 2254(b)(1)(A).

## IV. CONCLUSION

For the reasons discussed above, the Court will deny habeas relief and will not issue a certificate of appealability. An appropriate Order follows.

Date: April 24, 2025

_____s/ Stanley R. Chesler_____
**HON. STANLEY R. CHESLER**
**UNITED STATES DISTRICT JUDGE**